527 A.2d 610

Theresa R. Nevling, Petitioner *v.* Commonwealth of Pennsylvania, Department of Public Welfare, Respondent.

Dorothy M. Brennan, Petitioner *v.* Commonwealth of Pennsylvania, Department of Public Welfare, Respondent.

Argued December 9, 1986, before President Judge CRUMLISH, JR., Judge BARRY, and Senior Judge BARBIERI, sitting as a panel of three.

*Samuel L. Spear, Spear, Wilderman, Sigmond, Borish, Endy & Silverstein,* for petitioners.

*Catherine Stewart,* Assistant Counsel, for respondent.

OPINION BY JUDGE BARRY, June 16, 1987:

These appeals result from orders of the State Civil Service Commission (Commission), which concluded that Department of Public Welfare (DPW) employees Theresa R. Nevling and Dorothy M. Brennan (petitioners) had been properly furloughed from their jobs. The Commission decisions also concluded specifically that neither petitioner had been the victim of discrimination in the course of the furloughs.

Petitioners were and are presently[1] employed by the Southeast Pennsylvania Institutional Area Service Unit, DPW (SPIASU), an agency which prepares food at a central location for delivery and distribution to area DPW facilities requiring food service. Petitioner Brennan, before her furlough, was a principal supervisor at SPIASU, holding the rank of Food Service Manager II (FSM II). Petitioner Nevling, meanwhile, held the rank of Cook II, a kitchen job which included "lead worker" duties of a supervisory nature.

On November 1, 1984 services to one of the facilities which SPIASU served, Woodhaven Center, a men-

---

[1] As discussed later in this opinion, after petitioners were furloughed they accepted similar, but lower-level food service positions at SPIASU.

tal retardation program, were cancelled pursuant to a prior intra-agency agreement. As a result, the number of "meals per meal"[2] served by SPIASU decreased from approximately 850 to 550. This cancellation, as stated above, was predicted, and DPW thus planned a personnel reduction for SPIASU to correct for the loss of Woodhaven. The particulars of that reduction were described by the Commission in the following findings of fact:

7. The appointing authority [DPW] found that the decrease in the overall number of meals served amounted to a reduction in the total amount of work performed by the Dietary Unit of approximately fifty percent, due to the complicated nature of meals which had been served at Woodhaven.

8. In order to determine the complement necessary to operate the Dietary Unit under the new requirements, the appointing authority's Institutional Dietary Consultant (Terefencko) performed two independent staffing studies based on the appointing authority's workload after the loss of Woodhaven Center.

9. Based on the result of the staffing studies, Terefencko recommended [52] positions as the necessary complement for the Dietary Unit, and also recommended a corresponding reduction in the staffing level structure to conform with the new total.

*Commission's Decisions* at 2.

Having concluded that this reduction was appropriate, DPW established an appropriate classification scheme and then implemented a furlough procedure.

---

[2] This phrase of art merely describes the number of meals prepared for each of the three normal dining periods which occur during the day.

Petitioner Brennan was "furloughed from her position [as FSM II] and subsequently offered a bump into a Food Service Manager I [FSM I] position." Petitioner Nevling was "furloughed from her position [as Cook II] and subsequently offered a bump into a Cook I position." Petitioners accepted the new positions but nevertheless appealed the furloughs to the Commission.

At a hearing before the Commission DPW presented witnesses who explained the methodology used in the determination that a personnel reduction and reorganization at SPIASU was appropriate due to the loss of Woodhaven as a major food service client. Petitioners, however, testified that, notwithstanding the loss, the nature of their duties in their *new* classifications had not changed. Petitioners also submitted testimony in support of their discrimination claims. The Commission, however, dismissed the appeals, concluding that the furloughs were justified and that discrimination had not been shown. Petitioners then instituted the present appeal.

Our own review is limited to determining whether the Commission's findings are supported by substantial evidence, whether an error of law was committed, and whether any constitutional rights were violated. *Estate of McGovern v. State Employees' Retirement Board,* 512 Pa. 377, 517 A.2d 523 (1986). Petitioners allege on appeal (1) that substantial evidence does not support the existence of a lack of work justifying the furlough action; (2) that, even if a lack of work existed, DPW acted unlawfully and discriminatorily in furloughing them when the alternative procedure of reclassification with "salary save" was available; and (3) that the Commission erred in concluding that discrimination had not been proven.

## 1. *Propriety of the Furlough — Demonstration of Lack of Work*

When the propriety of a furlough is challenged by a regular status employee, the burden of proof rests with the appointing authority to demonstrate justification for the action by showing either a lack of funds or lack of work. *See Department of Public Welfare v. Magrath,* 14 Pa. Commonwealth Ct. 257, 261-62, 321 A.2d 403, 404-05 (1974). In the present case, the appointing authority sought to establish the propriety of the furloughs by showing that a lack of work existed due to the loss of Woodhaven as a food service client. We conclude that the Commission ruled properly in finding that DPW made such a showing.

Toward that end DPW presented testimony from its dietary consultant, Terefencko, who explained the staffing studies she performed which ultimately concluded that a reduction in force and realignment of structure at SPIASU was in order because of the substantial reduction in the number of meals it was responsible for each day. Terefencko explained that the number of "meals per meal" had been reduced from 850 to 550 per day, and that this reduction was especially significant because the preparation of food for Woodhaven was often more involved than that for the other facilities. Terefencko thus concluded that a total reduction of employees was merited and that the structure of the supervisory staff should be adjusted accordingly. Pursuant to this conclusion, Terefencko and other witnesses explained, Petitioner Brennan, a FSM II, was furloughed, as was Petitioner Nevling from her job as Cook II. Both of these jobs, it is to be noted, included supervisory duties.

Terefencko's testimony was given credence by the Commission, and, indeed, the common-sense inference that a work reduction took place due to the net loss of

one third of the food for which SPIASU was responsible is not seriously contested by the petitioners. Instead, petitioners argue that DPW's estimate of the work-loss was too high, and that an excess number of furloughs resulted. More to the point involved herein, however, petitioners also argue that the concomitant supervisory realignment was misconceived, because (1) in Brennan's case, the Food Service Manager I position she assumed continued to include the same job tasks as did the abolished FSM II job; and (2) in Nevling's case, the Cook I position to which she was "bumped" continued to include the same supervisory powers she possessed while classified as a Cook II, notwithstanding instructions, in her case, that she was no longer to function in any supervisory capacity. In short, petitioners maintain that while a loss of work may have occurred, the loss did not affect *their* positions, and petitioners hence argue further that the furlough—and subsequent reorganization—was unmerited.

In response to these precise arguments, however, the Commission articulated the following persuasive analysis:

> [I]t appears to our reasonable minds . . . that a reduction in the number of workers in a particular unit would clearly result in a realignment of the unit's grade structure; for the appointing authority to do otherwise would necessarily bring about an organization top-heavy in supervisors. Moreover, the grade/classification composition of the [SPIASU] workforce was here primarily determined by the number of meals served. Having proven that the number of meals served . . . had decreased, and that such a decrease in work resulted in a reduction of the personnel requirements, the appointing authority has . . . established lack of work as a proper basis for furlough.

*Commission Decisions* at 3-4. The foregoing analysis, in our view, effectively refutes petitioners' argument. DPW clearly acted legitimately in furloughing petitioners when the supervisory jobs they held were no longer justified due to a loss in the quantity and complexity of work which formerly provided the basis for those jobs. That the new, reclassified jobs they later accepted may have included similar tasks does not compel the conclusion that reorganization of the SPIASU supervisory structure was not merited because of the work loss. *See generally Vovakes v. Department of Transportation,* 71 Pa. Commonwealth Ct. 3, 453 A.2d 1072 (1982):

> The testimony presented before the Commission here clearly indicated that the reorganization was undertaken so as to streamline the functions of the department and thereby to increase departmental efficiency. And, as we stated in Department of Public Welfare v. Magrath, 14 Pa. Commonwealth Ct. 257, 321 A.2d 403 (1974), the laws of this Commonwealth have committed to the various administrative officials, not to the Civil Service Commission or the courts, decisions as to what best promotes the efficiency of the agency's services to the public.

*Id.* at 7, 453 A.2d at 1074. *See also Commonwealth v. Stecher,* 506 Pa. 203, 484 A.2d 755 (1984):

> It is a managerial prerogative to reallocate work to enhance operational efficiency and to effect cost savings. To limit management's power in this area would be to draft a blueprint for an ever-expanding bureaucracy, which naturally will tend to fuel institutional growth and taint the very purpose of our government. . . . To interpret the Civil Service Act as constraining reassignments of employees' duties, when management undertakes to eliminate what it be-

lieves to be unnecessary employees, would impose an impenetrable obstacle to attainment of greater efficiency in government. . . .

*Id.* at 211-12, 484 A.2d at 759 (Court endorsing *Magrath*).

2. *Propriety of the Furlough — Decision Not to Apply 4 Pa. Code §99.42*

Petitioners also maintian that, even if a lack of work was shown, DPW acted illegally in imposing a furlough rather than a reclassification under 4 Pa. Code §99.42. That regulation provides, in pertinent part, as follows:

(a)   When a position is classified by proper classification authority to a class with a lower maximum rate of pay due to a change in the duties and responsibilities of the position as a result of action such as, but not limited to, redistribution of duties, modification of responsibility, or general program reorganization—the regular or probationary incumbent of the position shall be reassigned if possible.

*Id.* Under this regulation, a corrective personnel action may be taken without a loss of salary.

According to a DPW witness at the hearing, this type of personnel action is appropriately initiated by the appointing authority when there is

no sudden or 'drastic' reduction in work . . . [but where, instead] the classification structure of the appointing authority is merely adjusted, upward or downward, to reflect the actual work being allocated to each position.

*Commission Decisions* at 5. *See N.T.,* 3/7/85, at 73-76 (Testimony of G. M. Kane). Implementation of the section "permits [an appointing authority] in effect not to use the furlough procedure in [these] particular instances." *Id.* at 74. A furlough, in contrast, is appropri-

ately initiated when an immediate or "drastic" change occurs—*e.g.*, a predicted loss of funds or work.

The Commission accepted as definitive DPW's construction of this regulation, and we detect no error in such construction. The statutorily-established personnel action[3] to be undertaken when a lack of work exists is the furlough, but it is entirely reasonable that agencies be supplied with the authority to take less drastic personnel actions when the circumstances demand classification adjustment but do not indicate that immediate separation is necessarily appropriate. Recalling, as we must, that the construction given a regulation by those charged with its execution is entitled to great weight, we hold that the Commission has attributed to the regulation its proper import. The decision to implement a reclassification under section 99.42 is one within the sound discretion of the appointing authority when found necessary to adjust the classification structure to the actual work being allocated to each position.

Against the backdrop of this construction the Commission concluded that petitioners had not demonstrated that a section 99.42 reclassification was appropriate under the circumstances. In addition, the Commission concluded that DPW had not engaged in discrimination by implementing section 99.42 to some employees while furloughing others:

> Here . . . , the appointing authority has credibly demonstrated that the Woodhaven Center's closing drastically reduced the work performed by the appointing authority, and that such reduction in work made a reorganization and furlough necessary. Furthermore, appellant[s have] introduced no conclusive evidence that [they are] continuing, after furlough, in [their] same pre-furlough duties, which might otherwise

---

[3] *See* Section 802 of the Civil Service Act, 71 P.S. §741.802.

suggest the propriety of the 99.42 procedure;
nor [have] appellant[s] proven that similarly situ-
ated employees were treated differently.

*Commission Decisions* at 5.

The foregoing analysis embraces findings well sup-
ported in the record and a legal conclusion consistent
with those findings. Accordingly, we conclude that
DPW neither abused its discretion in determining that
a section 99.42 procedure was not called for, nor en-
gaged in discrimination in the course of undertaking the
furlough action.

### 3. *Allegation of Age Discrimination*

Petitioner Brennan also alleged at the hearing that
she had been discriminated against on the basis of her
age. Petitioner, however, adduced no testimony
supporting this allegation, beyond her own statement
that this was her belief regarding the furlough and her
hearsay statements that younger colleagues at similar
facilities in FSM II positions had not been furloughed.
Because such testimony is not sufficient to meet
petitioner's burden of showing discrimination, *see
Quarles v. Department of Transportation*, 61 Pa. Com-
monwealth Ct. 572, 575, 434 A.2d 864, 865 (1981), we
conclude that the Commission committed no error in
rejecting, as articulated below, the allegation:

[A]ppellant [has] contend[ed] that the appoint-
ing authority's action was discriminatory in that
the appointing authority decided on a furlough
action knowing that appellant was at an age
when it would be difficult to find employment
elsewhere. . . . However, in the absence of any
evidence of [the alleged] intent on the part of
the appointing authority, and appellant's failure
to introduce evidence that the furlough had an
otherwise disproportionate effect on older em-

ployees, we fail to find any indication of discrimination on the basis of age.

*Commission Decision* (No. 5528) at 5.

4. *Conclusion*

For the foregoing reasons, the orders of the Civil Service Commission are affirmed.

ORDER

AND NOW, June 16, 1987, the orders of the State Civil Service Commission, Appeal Nos. 5528 and 5538, both dated July 30, 1985, are hereby affirmed.