# Wilcha v. First National Bank of Jermyn

48

*Peter G. Loftus,* for plaintiff.
*Daniel T. Brier,* for defendant.

O'MALLEY, *J.,* February 9, 1995—This action involves a lawsuit filed by Mary Wilcha, an at-will employee, against her employer, The First National Bank of Jermyn. Claiming discharge, demotion and failure to promote, she charges age discrimination under the Pennsylvania Human Relations Act (Count I); wrongful discharge (Count II); intentional infliction of emotional distress (Count III); punitive damages (Count IV) and equitable relief (Count V).

The defendant bank has filed a motion for summary judgment which is hereby granted.

A trial court may properly grant summary judgment, under Pa.R.C.P. 1035(b) when the moving party has established that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *SEPTA v. Simpkins,* 167 Pa. Commw. 451, 648 A.2d 591 (1994). Summary judgment is to be entered only in those cases that are clear and free from doubt, where the uncontroverted allegations of the pleadings and the other permissible material filed in support of and in opposition to the motion reveal that there is no genuine issue as to a material fact and that the movant is entitled to judgment as a matter of law. *Cooperstein v. Liberty*

*Mutual,* 416 Pa. Super. 488, 611 A.2d 721 (1992). The burden rests upon the moving party to demonstrate clearly that there is no genuine issue of material fact. In determining whether there is a dispute of material fact, the court must take the view of the evidence most favorable to the non-moving party and give that party the benefit of all favorable inferences that may be reasonably drawn from the evidence. *Graf v. State Farm Insurance Co.,* 352 Pa. Super. 127, 507 A.2d 414 (1986). A fact is material if it directly affects the disposition of a case. *Allen v. Colautti,* 53 Pa. Commw. 393, 417 A.2d 1303 (1980).

Summary judgment may be granted only where the right is clear and free from doubt. *Britamco Underwriters Inc. v. Weiner,* 431 Pa. Super. 276, 636 A.2d 649 (1994). The court's responsibility is merely to determine whether such an issue of material fact exists; the court does not resolve the issue on its merits. *Rutherfoord v. Presbyterian-University,* 417 Pa. Super. 316, 612 A.2d 500 (1992); only whether there are issues of fact to be tried. *Mylett v. Adamsky,* 139 Pa. Commw. 637, 591 A.2d 341 (1991). The function of a summary judgment is to avoid a useless trial. *William J. Heck Builders Inc. v. Martin,* 315 Pa. Super. 395, 462 A.2d 253 (1983). The purpose of the rule is to allow the moving party to disclose the facts of his claim or defense. *Elder v. Nationwide Insurance Co.,* 410 Pa. Super. 290, 599 A.2d 996 (1991). "Our rules of civil procedure are designed to eliminate the poker game aspect of litigation and compel the players to put their cards face up on the table before the trial begins." *Roland v. Kravco Inc.,* 355 Pa. Super. 493, 501, 513 A.2d 1029, 1034 (1986).

It is well established that a non-moving party who does not oppose a properly supported motion for sum-

mary judgment with affidavits, depositions, or the like, may not rely on the allegations of his pleadings to controvert the facts presented by the moving party's depositions. *Pa. Gas & Water Co. v. Nenna & Frain Inc.,* 320 Pa. Super. 291, 467 A.2d 330 (1983). Where a motion for summary judgment has been made and properly supported, a party seeking to avoid the imposition of summary judgment must show by specific facts in his or her depositions, answers to interrogatories, admissions or affidavits that there is a genuine issue for trial. *Marks v. Tasman,* 527 Pa. 132, 589 A.2d 205 (1991). The court must ignore controverted facts contained in the pleadings and restrict its review to material filed in support of and in opposition to a motion for summary judgment and to those allegations in pleadings that are uncontroverted. *Atkinson v. Haug,* 424 Pa. Super. 406, 622 A.2d 983 (1993). The mere fact that a party fails to submit counter-affidavits does not automatically render summary judgment appropriate under Rule 1035(d). It is preliminarily imperative that the moving party's affidavit evidence clearly dispel the existence of any genuine factual issue as required by Rule 1035(b). *Knecht v. Citizens & Northern Bank,* 364 Pa. Super. 370, 528 A.2d 203 (1987). Rule 1035(d) provides that if the non-moving party does not respond, summary judgment, *if appropriate,* shall be entered against him. *Gooden v. Bimeal and Marino,* 37 Somerset Leg. J. 219 (1979). Sustaining a motion for summary judgment is only appropriate if there is no genuine issue of material fact, and the applicable law entitles the moving party to judgment. *Wright v. North American Life Assurance Co.,* 372 Pa. Super. 272, 539 A.2d 434 (1988).

In ruling upon a motion for summary judgment, facts which do not appear in the record, and which are presented merely in the context of an argumentative brief

may not be considered by the court. *Edwards v. Pennsylvania Housing Finance Agency,* 71 Pa. Commw. 22, 453 A.2d 1080 (1983).

In support of its motion for summary judgment, the defendant has filed various affidavits and has taken the plaintiff's deposition. This latter process covered two days (February 27, 1992 and June 19, 1992) and resulted in some 360 pages of mind numbing testimony which we have faithfully annotated in our attempt to ascertain whether a summary judgment should be granted the defendant. Aside from her testimony in the said deposition the plaintiff has presented nothing to controvert these materials of the defendant.

## AGE DISCRIMINATION

An examination of the plaintiff's amended complaint and her deposition taken by the defendant leads us to conclude that she is alleging five instances of age discrimination although it is far from clear that this is the case. Age discrimination, she asserts, was involved in (1) a demotion, on December 21, 1988, when she went from note department supervisor (she was the only person in the department, Dep. 38, 48, 49, 334) to the alleged lower position of credit balancing clerk. See amended complaint, paragraph 13; (2) a refusal on the part of the defendant, on December 21, 1988, to promote her to the position of loan processing supervisor. See amended complaint, paragraphs 12, 21; (3) in March 1989 when the defendant, after the plaintiff walked off the job on December 21, 1988 and, in her eyes she was discharged, posted her position. Amended complaint, paragraphs 15-17; (4) in May 1989 when she was "discharged." Amended complaint, paragraph 18; (5) in August 1989 when she applied for a full-time

job as administrative assistant to the defendant's CEO but was not hired. Dep. 171, 245-249, 265, 313, 315.

Anti-discriminatory legislation is not intended to be used as a means of reviewing the propriety of a business decision on the part of the employer and thus does not seek to affect employer decisions based on individual assessments of a person's abilities. 14A C.J.S. Civil Rights, p. 103; *Billet v. Cigna Corp.,* 940 F.2d 812 (3rd Cir. 1991). Such legislation must not be permitted to become a mechanism to inhibit ordinary managerial decisions. *Gray v. York Newspapers Inc.,* 957 F.2d 1030 (3rd Cir. 1992). Courts in these matters do not sit as a super-personnel department that re-examines an entity's business decisions. *Dale v. Chicago Tribune Co.,* 797 F.2d 458 (7th Cir. 1986).

Specifically, with regard to age, anti-discriminatory legislation cannot protect older employees from erroneous or even arbitrary decisions. Accordingly, an employer may hire or fire, and demote or promote any employee on the basis of purely subjective reasons, even if such reason is shortsighted or narrowminded, as long as age is not a determining factor in that decision. 14A C.J.S. Civil Rights, p. 103; *Miller v. General Electric Co.,* 562 F. Supp. 610 (1983). This legislation does not mandate special treatment be accorded those within the protected group, but only that employers treat age neutrally. It does not insulate aged employees from competition with qualified younger employees, and not every personnel decision by an employer which results in differential treatment of individuals in a protected class is a violation. 14A C.J.S. Civil Rights, p. 104. "A decision affecting an employee in the protected class does not become a discriminatory decision merely

because made in the context of a reorganization or because a younger employee is benefited by the decision." *Billet, supra,* p. 827.

The language of Rule 1035, adopted in 1966, was taken verbatim from Federal Rule of Civil Procedure 56(c). Interpretation of the scope of Rule 1035 can be aided by reference to the cases decided under the federal rule. *Wilk v. Haus,* 313 Pa. Super. 479, 460 A.2d 288 (1983). Summary dispositions can be applicable in employment age discrimination cases. *Billet v. Cigna Corp., supra.*

A cause of action based on age discrimination in Pennsylvania is found in 43 P.S. §955 et seq. of the Pennsylvania Human Relations Act which forbids, inter alia, discrimination in employment based on age. Section 955(a) recites that it shall be an unlawful discriminatory practice for any employer because of the age of any individual to discharge from employment such individual or to otherwise discriminate against such individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual is the best able and most competent to perform the services required. Pennsylvania courts use federal interpretations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000 et seq. as guides in interpreting the Act. *Jacques v. Akzo International Salt Inc.,* 422 Pa. Super. 419, 619 A.2d 748 (1993). Furthermore, the appropriate legal analysis is very similar for PHRA and the Age Discrimination in Employment Act, 29 U.S.C. §§621-624, (ADEA). *Stouch v. Brothers of Order,* 936 F. Supp. 1134 (E.D. Pa. 1993).

The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *Cat-*

*erpillar Tractor Co. v. Commonwealth,* 78 Pa. Commw. 86, 466 A.2d 1129 (1983). Nevertheless, the burden of persuasion on summary judgment remains unalterably with the defendant here as movant. *Sorba v. Pennsylvania Drilling Co. Inc.,* 821 F.2d 200 (3rd Cir. 1987).

"Because [the plaintiff] bears the burden of persuasion to show that he was the victim of intentional age discrimination, [defendant is] entitled to summary judgment if [it] can demonstrate that [the plaintiff] could not possibly carry his burden of proof at trial. A defendant may demonstrate this in two ways: (A) by showing that the plaintiff is unable to establish a prima facie case of discrimination; or, if the plaintiff has successfully established a prima facie case, (B) by showing that the plaintiff could not produce sufficient evidence of pretext to rebut the defendant's articulated non-discriminatory reasons for the discharge." *Stouch, supra,* p. 1143.

## A.

With regard to the establishment of a prima facie case, our Supreme Court, in *Allegheny Housing Rehabilitation Corporation v. Pa. Human Relations Commission,* 516 Pa. 124, 532 A.2d 315 (1987) designated for use in employment discrimination cases the analytical mode which had been adopted by the United States Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). Under that model, the plaintiff's burden of establishing a prima facie case of unlawful discrimination could be met by showing: (1) that the plaintiff belongs to a racial minority; (2) that he applied and was qualified for a job for which the employer was seeking applicants; (3) that, despite his qualifications, he was rejected; and (4) that, after his rejection, the position remained open and the em-

ployer continued to seek applicants from persons of the plaintiff's qualifications. The Pennsylvania Supreme Court noted, in *Fairfield Township Volunteer Fire Co. v. Pa. Human Relations Commission,* 530 Pa. 441, 609 A.2d 804 (1992) as it did in *Allegheny Housing,* that this standard is adaptable to accommodate differences in the nature of the discrimination alleged (*e.g.,* sex and age rather than race) and in the action alleged to be improper *(e.g.* discharge, demotion or failure to promote rather than refusal to hire). Actions alleged to be improper all fall under the general heading of adverse employment actions. *Butler v. Elwyn Institute,* 765 F. Supp. 243 (E.D. Pa. 1991). The plaintiff, under this analytical model must, in short, prove in age cases that age was a determining factor in an adverse decision concerning his employment. *Brieck v. Harbison-Walker Refractories,* 624 F. Supp. 363 (W.D. Pa. 1985); 14A C.J.S. Civil Rights, p. 103. Establishing the prima facie case gives rise to a presumption, but it is only a presumption, that discrimination was the basis for the employer's action. *Consolidated Rail Corporation v. Pa. Human Relations Commission,* 136 Pa. Commw. 147, 582 A.2d 702 (1990).

## B.

If the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for its action. Should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Caterpillar Tractor Co., supra.*

"The presumption [raised by the plaintiff's prima facie case], having fulfilled its role of forcing the defendant to come forward with some response, simply drops out of the picture ... ." *St. Mary's Honor Center v. Hicks,* 113 S.Ct. 2742, 2749 (1993).

The law under *Hicks* is that the defendant's reason "cannot be proven to be a pretext *for discrimination* unless it is shown *both* that the reason was false *and that* discrimination was the real reason." *Id.* p. 2752.

"In the context of a summary judgment proceeding, *Hicks* requires that, once the employer has advanced a legitimate, nondiscriminatory basis for its adverse employment decision, the plaintiff, before becoming entitled to bring the case before the trier of fact, must show evidence sufficient for the factfinder reasonably to conclude that the employer's decision to discharge him or her was wrongfully based on age." *LeBlanc v. Great American Insurance Co.,* 6 F.3d 836, 843 (1st Cir. 1993).

### a. Discharge

Viewing matters most favorably to the plaintiff nonmoving party, as we must, it appears she claims discharge on two bases: in March 1989 her job was posted according to company policy when she declined to return to this full-time position and in May 1989 when, according to her amended complaint, she was discharged. The defendant, by answer and affidavits, disputes this. Its deposition of the plaintiff supports this position.

Using the analytical model referred to us in *Allegheny Housing Authority, supra,* it has been stated that an employee alleging discriminatory discharge because of age makes out a prima facie case: (1) by presenting

evidence that she belonged to a protected class;[1] (2) was performing duties she was qualified to perform; (3) was discharged; and (4) that a continuing need for the services the complainant had been performing existed. Summary of Pennsylvania Jurisprudence 2d, Torts, §12:51. A criterion, then, is discharge. An employee must have been discharged to state a claim arising from loss of his job. 14A C.J.S. Civil Rights, p. 114.

In the present case, though it appears the plaintiff was in the protected age group, was qualified to be doing the job she performed and that there was a continuing need for this job, she was not discharged. On the contrary, she voluntarily left the bank premises on December 21, 1988. See *Gray, supra.* Her leave-taking, by her own testimony, was due to her physical condition becoming chronic and to the plethora of physical and mental problems with which she is afflicted which have made it impossible for her to be gainfully employed. Her testimony in this respect is bolstered by further testimony that she received workers' compensation (said claim being commuted for $70,000), is presently on Social Security disability and has applied for long-term disability benefits under a policy obtained through the defendant. The chronic nature of her problems and her conscious decision to leave her bank employment of her own free will is further substantiated by her testimony that her condition does not allow her to work full-time. It should be pointed out that her testimony in this latter respect is confusing and, to some degree, conflicting. We hasten to add that we are not passing on the plaintiff's credibility which is not a matter that

---

1. The Pennsylvania Human Relations Act, in 43 P.S. §954(h) applies to those persons who have attained age 40 but have not yet attained their seventy-first birthday.

can be resolved on summary judgment. *Dillon by Dillon v. National Railroad Corporation,* 345 Pa. Super. 126, 497 A.2d 1336 (1985). Rather, we are noting that, at the very most, she could not work at all, and, at the very least, she could only work part-time, the last a job scheme for which the defendant has no openings.

In her amended complaint, in paragraphs 7 and 8, the plaintiff avers she suffered a work-related neck and back injury but continued to work for the defendant full-time until her injury became "chronic" on December 21, 1988. After she voluntarily left the bank's premises during the work day of December 21, 1988 she called in sick the following day after seeing her chiropractor, Dr. Lorenzetti, who told her to take time off because of the stress. Dep. 63, 64, 67, 87. She has not worked since that date anywhere. The meeting on December 21, 1988 wherein the defendant's employees were assigned job titles to reflect their duties as the result of the defendant's restructuring program, aggravated the disc problems in her neck and back, the results of her work injury, because of stress. Dep. 68, 69. Dr. Lorenzetti told her to take time off right away. Dep. 87. She went through mental depression on "the day I walked out of the bank, December 21." Dep. 105. Her back condition became chronic when she left on December 21. Dep. 145. She is in "chronic pain." Dep. 291. She is in physical chronic pain and mental chronic pain. Dep. 303. She went into total mental depression on December 21. Dep. 303, 308. She had been doctoring for her work-related disc problems, a herniated disc in the neck and two protruding discs in the back prior to December 21 but it got so bad by that date that the doctor wanted her to take time off. Dep. 308. On that date she went into mental depression. Dep. 308. She had pain before December 21,

1988. Dep. 306. Her physical limitations make it impossible for her to work in the job she had with the defendant. Dep. 355.

In her deposition the plaintiff recited her physical and emotional problems. She sees a Dr. Holmes every two or three months. Dep. 8. She takes Elavil for her chronic pain. Dep. 8, 22. She was in the hospital in the week prior to February 22, 1992. She has been to Philadelphia about her disc problem. Dep. 9. She sees Dr. Pelicci who is a neurologist every three months. She sees Dr. Lorenzetti every week and has done so since 1988. Dep. 10. Her said visit to the hospital was necessitated because of bleeding from an ulcer in her rectum. Dep. 13, 20, 281, 282. Dr. Pelicci is also a psychologist. She sees him mostly for her neck and back. Dep. 14. She saw Dr. Doherty in 1987 for her neck and back problems. Dep. 15. She has seen Drs. Norcross, Black, Holla and another doctor in the Towers Building. Dep. 15, 16. Dr. Norcross runs a pain clinic. Dep. 17, 18. She has had eight operations over the years but won't have one for the disc problems. Dep. 21. She can't lift over 10 lbs., can't stand long or sit long. Dep. 24-26. She is in pain and her lifestyle has changed completely. Dep. 27. Two days a week she lies down during the day. Dep. 28, 187, 188. She lost control of her bowels in October 1987 (and was out for a month, amended complaint, paragraph 8) and consulted a Dr. Cahill at Geisinger about this and also saw Dr. Cianni. Dep. 32, 33. She is depressed. Dep. 36, 37. She had been seeing Dr. Lorenzetti three times a week and he is her primary doctor. Dep. 87, 88. She went to Dr. Pelicci first, sometime in 1990 but can't remember the exact date. Dep. 88. She was in pretty bad pain from the beginning of 1989 to November 1989, worse than she was at the time of this February

1992 deposition. Dep. 88. In November 1989, Dr. Lorenzetti sent her for an MRI. She was on Parafon and Tylenol with codeine. Dep. 88, 89. She was in a lot of pain, physical and mental. Dep. 89. She was seeing Dr. Cirincione in 1989 and he was a psychologist. Dep. 124. One doctor told her she would never be able to work again. Dep. 168. She is losing the feeling in the left side of her body and this has been going on for about a year due to the herniated disc. It comes and goes but will probably get worse according to Dr. Pelicci. Dep. 182, 183. She is suffering from loss of strength in the left side of her body in her arm and leg. Her condition is worse than last year since she is losing more feeling. Dr. Pelicci wants her to have her hands operated on but she won't do this. Dep. 183, 184. The doctors intend to increase the current dosage of Elavil "because sometimes the chronic pain is so bad." Dep. 186. The doctors want to get her up to 200 milligrams per day of Elavil. Dep. 189. She has a non-work related disability of depression. Dep. 226, 227. She also has a history of colitis and bleeding ulcers. Dep. 227. She has never been diagnosed with depression but she cries a lot and Dr. Holmes knows she cries a lot. Dep. 228. She has been depressed since she lost her job. Dep. 229. She treated with Dr. Cirincione, a psychiatrist, but can't remember when she stopped seeing him. Dep. 230. Dr. Black recommended she initiate psychiatric counseling and sent her to Dr. Norcross who was not only a pain specialist but was also a psychiatrist. Dep. 231. She spoke to Dr. Pelicci about her depression at his office just a couple of weeks before the first portion of this deposition. Dep. 232.

In the second half of the deposition she states she sees Dr. Cianni, a gastroenterologist (for her bleeding ulcer), Dr. Lorenzetti, Dr. Pelicci and Dr. Holmes. Dep.

279, 280, 281, 288. She is still losing feeling but now it is in her arms and legs and is getting worse. Dep. 282, 283, 285. She does not have the power to grip real good. Dep. 282, 283. She has to do everything at a "very, very slow pace." Dep. 284. She cannot take physical therapy because that would aggravate the neck condition. Dep. 286, 287. The doctors want to operate. Dep. 282, 285, 287, 288. She is now taking Fiourset and Tylenol 3 with codeine as well as regular Tylenol. Dep. 286, 287. The Fiourset is for headaches. Dep. 289. She is also taking Elavil for depression and chronic pain. Dep. 291. She gets bad headaches. Dep. 338, 339.

In June of 1989, the plaintiff filled out forms for Social Security disability believing she merited it and, as of February 27, 1992, she was still receiving it. Dep. 119, 120, 121, 124, 221. At that time she told Social Security that she couldn't work because she didn't know whether she could. On February 27, 1992, she was getting Social Security disability in the amount of $293 per month. Dep. 119. On June 19, 1992 she started to receive $649 per month and has no plan to terminate it. Dep. 292. She also filed a claim for workers' compensation for her work-related injuries and ultimately commuted this claim on November 25, 1991 for $70,000. Dep. 11, 221, 234. Furthermore, she applied, on December 21, 1991, for long-term disability benefits under a policy issued through the defendant. Dep. 218, 292. On the application she stated that, as of December 21, 1988, she was not able to engage in any gainful occupation. Dep. 221, 292.

Subsequent to the plaintiff leaving work on December 21, 1988, Dr. Lorenzetti told her she could return to employment but only for one half a day. Dep. 89, 90, 91, 116, 117, 315. Between December 22, 1988 and

March 1989, when her job was posted according to bank employment procedure, she was not able to work at all. Dep. 91. When she received notification in March that her job was being posted, the plaintiff really wanted to go back but the doctor told her to try it part-time. Dep. 99. She can't remember if Dr. Lorenzetti ever released her back to work full-time. Dep. 100. She never asked any doctor if she was well enough to return full-time since her ability to perform a particular job's duties depended on the job. Dep. 100, 130. She doesn't know if there was a bank job she could do full-time because "they change so much." Dep. 100. As of February 27, 1992 she was of the opinion that she was disabled to the extent that she could not work and it was not just physically. She "might be" able to work part-time. Dep. 101. She does not know if she was capable of working full-time. Dep. 104. She has not looked for a job since 1989. Dep. 105, 115, 116. Dr. Pelicci said she should not work full-time, "that if somebody should bump me, that they might cause my injury to become much worse." Dep. 107, 108. She can't recall when he first told her this. Dep. 107. Dr. Lorenzetti felt she shouldn't go back to work full-time. Dep. 108, 109. On her physical basis alone, she does not really know if she could work a full day but she is not trying to find out. Dep. 108. She doesn't know if she would be medically permitted to work part-time because she probably has not asked the doctors if she could since 1989. She does not really know if she wants to work part-time. Dep. 188. Dr. Pelicci is the one who has instructed her not to work full-time. Dep. 182. Based on the loss of feeling and strength in the left side of her body, Dr. Pelicci has ordered her not to work full-time. Dep. 184. He has not told her not to work part-time just that he feels she is "sort of disabled." Dr. Pelicci

has limited her in terms of working part-time. She does not know if she can work part-time. Dep. 185. No doctors have never instructed her not to work part-time—they have not said anything. She has not asked them. But she knows Dr. Pelicci does not want her to work full-time. Dep. 186.

On June 19, 1992, her feeling was she was unable to work. She cannot be under stress. She has not been able to work since the last deposition date of February 27, 1992. Dep. 292. She told Social Security in June 1989 that she couldn't work "because I didn't know whether I could" but she was willing to try. Dep. 315, 318. "I told you before, maybe I wanted to go back to work." Dep. 318. When Dr. Lorenzetti sent her for an MRI in November 1989 and she found out about a herniated disc in her neck, she didn't seek any further employment. Dep. 88, 329, 356. The doctors told her if she went back to work she could become really bad, especially hurting it again. Dep. 329, 356. From 1989 to the date of this deposition segment, it was the doctor's opinion she could not perform her job with the defendant. Dep. 356, 357. "He felt I couldn't." She deferred to that opinion. Dep. 357.

The plaintiff testified that in March 1989, when her job was posted, "Bill Davis, bank vice president, refused me permission to return to work part-time because he wanted me full-time." Dep. 254, 268. In response to Dr. Lorenzetti informing Davis she could work part-time, the doctor was told that the bank would not take the plaintiff back part-time as the defendant had no part-time work. Dep. 90, 126, 312, 326, 327, 348, 349. The plaintiff didn't reply to the defendant's letter in March 1989 stating that her job would be posted because she had been out since December 21, 1988 and the plaintiff did not know when she would return "because

the doctor didn't want me to return." Dep. 349. It appears there is a further conflict in the plaintiff's testimony or else once again in *June 1989,* Dr. Lorenzetti told Davis she could not work full-time. Dep. 315, 316, 318. In any event, though the defendant may have employed part-timers on occasion, the plaintiff did not know whether there were any part-time positions open in 1989 and no one ever told her there were. Dep. 117. She had no idea if there were any such vacancies. Dep. 169, 312.

That the plaintiff was never discharged is further buttressed by her testimony that the bank, after she left, continued to contact her about posted jobs. Dep. 102. There were either five or six (Dep. 171) or 10 or 15 (Dep. 357) posted jobs she was informed of. She followed up on one, that of administrative assistant, which she felt she could do. Dep. 103, 172, 173, 358.

The plaintiff testified she was not fired on December 21, 1988. Dep. 166. As to the relevance of the May 1989 date set forth in the amended complaint:

"A. I just felt at that time—I guess I just felt I was discharged since they wouldn't take me back.

"Q. Did anyone from the bank tell you you were discharged?

"A. No one ever called me from the bank." Dep. 170.

She "felt" that she was discharged in March 1989 because the defendant would not take her back to part-time work. She never called the bank to see if she was discharged. Dep. 170, 171. She felt she lost her job, not in May 1989, but on December 21, 1988. Dep. 229. "No, I wasn't fired. I felt I had lost it." Dep. 229. "I felt I lost my job in December of 1988." On that date, "I was not terminated. I was demoted." Dep.

230. She was fired "indirectly" when Davis would not take her back in June 1989. Dep. 311.

If by "indirectly" the plaintiff means a constructive discharge as opposed to an actual discharge the groundwork is not present for this theory either. To adopt it would cause us to ignore the plaintiff's own testimony that health reasons caused her to leave of her own volition. An objective test is employed in determining whether an employee was constructively discharged from employment: whether the conduct complained of would have the foreseeable result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes would resign. *Gray, supra.*

A decision of interest is the case of *Goss v. Exxon Office Systems Co.,* 747 F.2d 185 (3rd Cir. 1984). In *Goss* a married woman who was a successful sales representative for the defendant became pregnant. Her supervisor expressed doubt regarding her ability to combine motherhood and a career. She suffered a miscarriage but returned to work with no loss of time. She again became pregnant and, in a meeting with her supervisor, he became verbally abusive and indicated he was thinking about removing her from a large account again voicing his doubts as to whether she could do her job. After another miscarriage she returned to work and was told she no longer would have her usual territory and was being replaced. After objecting, she was ordered to sign a writing accepting her new territory or resign. The supervisor described Goss as a "wackko, pregnant and likely to leave." This was considered constructive discharge.

In *Levendos v. Stern Entertainment Inc.,* 860 F.2d 1227 (3rd Cir. 1988) the plaintiff employee filed an affidavit stating that she was the only woman in a man-

agement position; that she was excluded from management meetings; that the general manager of the restaurant where she worked boasted she wouldn't be there long; that management told other employees that the plaintiff did not fit the mold of a maitre'd because she was a woman; that the owner asked an employee to find a man to replace the plaintiff; that management falsely accused her of stealing, drinking and fraternizing with employees; and that on one evening she discovered wine bottles placed in her locker to make it appear as if she were stealing. A supporting affidavit was filed praising the plaintiff's work and reputation and stating that management disliked women. In her complaint the plaintiff alleged she was not allowed to order supplies although a male manager was allowed to do so and that she was replaced by a male friend of the chef. Ultimately she resigned. Summary judgment in favor of the defendant employer was vacated, constructive discharge having been determined.

Nothing in the present case even remotely approaches these situations. The plaintiff has not established a prima facie case as to discharge on March 29, 1989 or discharge in May 1989.

### b. Demotion

The plaintiff alleges she has a cause of action for age discrimination under the PHRA when, according to her amended complaint, she was demoted to a position entitled credit balancing clerk on December 21, 1988. We do not agree.

The defendant denies, by answer and affidavit, that the plaintiff was demoted.

Applying and adapting the model referred to in *Allegheny Housing, supra,* the following considerations

are pertinent in ascertaining whether a prima facie case of age discrimination by demotion are present: (1) the plaintiff belongs to a protected age group; (2) she was performing duties she was qualified to perform; (3) she was demoted; and (4) a continuing need for the services the plaintiff had been performing at that level continued to exist. Although the first two and last criteria are present, the third criteria has not been met and accordingly, the plaintiff has not made out a prima facie case on demotion.

The above test set out in *Allegheny Housing* has been announced as applicable in civil service claims arising under the Civil Service Act, 71 P.S. §§741.1-741.1005. *Commonwealth, Department of Health v. Nwogwugwu,* 141 Pa. Commw. 33, 594 A.2d 847 (1991). It is therefore appropriate to refer to cases concerning this Act on the matter of demotion.

In *Shaefer v. West Chester State College,* 54 Pa. Commw. 327, 421 A.2d 503 (1980), the court noted that under that Act, demotion was defined as a change in status to a position in a class carrying a lower maximum salary. Evidence that the plaintiff's classification remained the same as did his salary meant that there was no demotion.

In *Carr v. Commonwealth, Department of Public Welfare, Woodville State Hospital,* 72 Pa. Commw. 78, 456 A.2d 240 (1983), it was held there was no demotion in the situation where the employee sustained no loss of salary or where the employee was reassigned to duties in line with his classification.

In its answer, paragraph 13, the defendant denied that the plaintiff underwent a demotion in being assigned the title of credit balancing clerk. The answer alleges that, in July of 1988, the defendant retained L.R. Weber & Associates to bring about the reorganization and

reclassification of all of its departments which was accomplished in December 1988. This was neither a promotional or demotional process. The title of credit balancing clerk was the title chosen by L.R. Weber & Associates for the job the plaintiff had been performing. The plaintiff's salary and duties did not change when she received this new title. Affidavits of the executive vice president and president/CEO of the defendant at the time all support the aforesaid averments along with the affidavit of the executive vice president of L.R. Weber & Associates Inc., Sara Williams, who developed the reorganization and reclassification plan. She specified in her affidavit that the plaintiff was assigned the credit balancing position because that position directly correlated with the job functions the plaintiff was performing prior to the reorganization as described by the plaintiff in a job questionnaire which she, along with the other employees of the defendant, completed.

The plaintiff, in the deposition the defendant took of her, testified as follows: At the meeting of December 21, 1988, when the defendant's employees were informed of their titles the plaintiff claimed she would receive less pay but Williams informed her this was not so. Dep. 69. Prior to the reorganization the plaintiff was classified a "seven" which is what she was afterward. Dep. 153, 154. She was not demoted but was left right where she was at. Dep. 154. No one ever told her that her pay would be reduced, she does not know if it would have been reduced and she has never thought too much about it. Dep. 156. "I was demoted in title, and I wasn't given the job I was promised. That's why I know I was demoted." Dep. 156. No one told her that her pay would be reduced. Dep. 157. She believes she was demoted because she was taken away from the job she should have been given but

does not know if there would have been a change of benefits under the reorganization because she never asked. Dep. 159. She never saw the job description for credit balancing clerk under the Weber plan. Dep. 166. She was not terminated, she was demoted and Williams told her so. Dep. 230, 308.

The plaintiff has not made out a prima facie case for demotion.

### c. Promotion

It appears two matters in the plaintiff's claim deal with the subject of promotion: (I) her failure to be promoted to the position of loan processing supervisor on December 21, 1988 and (II) the denial of her application for the position of administrative assistant to the bank's president when she was notified of this posting and applied for it in August 1989.

Adapting the *Allegheny Housing* formula for a promotion situation, we determine, to establish a prima facie case of age discrimination, the plaintiff must show that (1) she is in the protected age group; (2) that she was rejected for promotion; (3) that the position for which she was rejected was an available one for which she was qualified; and (4) that the position was ultimately filled by someone younger than the plaintiff.

### I. Loan Processing Supervisor Position

In her amended complaint, the plaintiff alleges that, on December 21, 1988, she was advised she would not be promoted to a loan processing supervisor position (Paragraph 12) and that, on December 21, 1988, one Donna Jubinski, 29 years old at the time who had been a mortgage insurance clerk with no experience in the job, received the position. (Paragraphs 21, 22.) The

defendant contravened these allegations by its answer in which it was set forth that in December 1988 L.R. Weber & Associates completed the reorganization and reclassification of all the bank's departments; that this was not a promotional process and the plaintiff was not denied promotion; that the plaintiff was simply assigned a title to describe the job she was doing (Paragraph 12); that the plaintiff was not doing the job of. loan processing supervisor prior to December 21, 1988 but that Jubinski was assigned this title because it was the job she was performing on that date (Paragraph 21) and that Jubinski had experience as she had worked in the loan and mortgage departments of the defendant. (Paragraph 22).

In addition the defendant developed affidavits to the effect that the reorganization was not promotional in nature (Davis); that the reorganization was not promotional and that the author of the affidavit never told the plaintiff or anyone else Wilcha would become loan supervisor (Moskovitz); that the reorganization was not promotional (Williams); and that Jubinski, who began working in the bank in January 1979 in the installment loan department of the bank and, in 1986, began to supervise the insurance department, received the position of loan processing supervisor because her responsibilities prior to the reorganization directly correlated with those of the loan processing supervisor (Scriven).

In the defendant's deposition the plaintiff testified that, at the time the reorganization plan was set forth for the defendant's employees on December 21, 1988, it "looked" to her that everyone who was younger got a better job. Dep. 70, 77, 78, 300, 325. Jubinski was to be the head of the installment loan department. Dep. 69. Under the reorganization the plaintiff was at

the top salary level in her category and she had no idea if she could move to a higher level. Dep. 155, 156. "Do you believe that they refused to allow you to return to work on the basis of your age? I can't say what they felt." Dep. 169. Discrimination resulted from the fact that they would not take her back part-time. Dep. 198, 198. She noticed jobs were being given to people that were a lot younger and this policy started in the summer of 1988. "The exact time I couldn't tell you." Dep. 205. But the plaintiff had no idea why they did not want her back. Dep. 215. Discrimination also took place after the date of June 28, 1989 when the bank refused to give her a job. Dep. 264, 265. She believes the bank should pay her benefits from December 21, 1988 when she walked out of the bank right up to the present. Dep. 256.

The mere fact that an older employee is replaced by a younger one does not permit an inference that the replacement was motivated by age discrimination. 14A C.J.S. Civil Rights, p. 113; *Chappell v. G.T.E. Products Corp.,* 803 F.2d 261 (6th Cir. 1986). Mere personal beliefs, conjecture and speculation are insufficient to support an inference of age discrimination. *Id.*

"The question is not whether [the employer] exercised prudent business judgment ... but whether [the employee] has come forward to refute the articulated, legitimate reasons for his discharge. In this regard, [the employee] must do more than challenge the judgment of his superiors through his own self-interested assertions. [The employees] perception of himself, however, is not relevant. It is the perception of the decision-maker which is relevant." *Dale v. Chicago Tribune Co.,* 798 F.2d 458, 464, 465 (7th Cir. 1986).

No one ever told the plaintiff that she was too old for her job. The closest comment she could dredge

up in this vein was "... Mr. Davis approached me and said something about my age, about my grey hair or something, must be terrible to be getting old." Dep. 205. This was the only comment the plaintiff could think of. Dep. 269. Truisms are not indicators of discrimination. Remarks merely referring to characteristics associated with increasing age do not constitute direct evidence of age discrimination. *White v. Westinghouse Electric Co.,* 862 F.2d 36 (3rd Cir. 1988).

She cited no evidence of any incident in which any official of the defendant ever discriminated against anyone else because of age or said anything to her which might indicate that the defendant was prejudiced against older employees.

The key in an employment discrimination case under the PHRA is not whether the complainant was treated fairly but whether any unfairness in the complainant's treatment was different from that accorded to persons not in the target minority group. Summary of Pennsylvania Jurisprudence 2d, Torts, §12:18.

Even if we were to find that the plaintiff satisfied the four criteria of *Pennsylvania Housing,* the defendant has shown she could not produce sufficient evidence of pretext to rebut the defendant's articulated nondiscriminatory reason for not promoting her, *i.e.,* this reorganization was not a promotion process and the person who received the newly created title of loan processing supervisor was the person whose prior job duties reflected this title. The plaintiff has adduced no evidence under Rule 1035 beyond her own hearsay statements and beliefs and this is not enough to contravene the facts presented by the defendant bank, the moving party. See *Nevling v. Department of Public Welfare,* 106 Pa. Commw. 625, 527 A.2d 610 (1987).

## II. Administrative Assistant Position

The plaintiff's final claim is that she applied for the position of administrative assistant to the president/CEO of the bank when that job was posted but one Crisley Sullivan was named to the position instead of her. She testified that when she applied for the job in August 1989, a vocational expert by the name of James T. Parks, hired by the bank to assist her in finding work, told her that Scriven, the human resources manager, told him that the bank would not take her back. Dep. 95, 99, 243, 248, 249, 313, 327, 360. Scriven, in her affidavit, denied she told Parks or anyone else that the defendant would not allow her to return but, on the contrary, sent numerous postings of available jobs with the bank to the plaintiff which the plaintiff admits, with the exception of this one, she ignored, *supra*. Parks, in his affidavit, denied Scriven or anyone else acting on behalf of the bank, told him the plaintiff would not be allowed to return. He also contradicted the plaintiff's assertion he had made this statement to her.

Crisley Sullivan was 42 when she received this position while the plaintiff was 51 at the time. Ms. Sullivan started at the bank in 1969 while the plaintiff started in 1968. According to Scriven's affidavit, Sullivan got the position because she was the superior candidate and was available to work full-time.

This was a full-time position. Dep. 173, 315. The plaintiff applied for this slot in August 1989 at the same time she applied for Social Security disability alleging she could not be gainfully employed. Dep. 250, 274, 313-315. She does not believe this to be a contradiction because of her situation:

"A person being told they're not going to be able to work [by her doctors] with a person who really wanted to." Dep. 250.

Although in the second segment of the deposition she states she would have tried to do this job (Dep. 315), when initially asked if she believed she could work full-time in the administrative assistant position, she replied:

"No, I didn't believe I would, but I really wanted to." Dep. 252.

Federal courts have held that an inference of age discrimination arises when the difference in ages between the plaintiff and the person securing the position is 20 years. Where the age difference is slight, that factor, without more, will not support an inference of age discrimination. *Maxfield v. Sinclair Intern.,* 766 F.2d 788 (3rd Cir. 1985), *cert. denied,* 474 U.S. 1057 (1986). Here the spread was nine years. The plaintiff started her job with the bank only one year before Sullivan. This situation does not strike us as one constituting a prima facie case of age discrimination. Even assuming it was, the employer's reasons for choosing Sullivan, superior job qualifications, for what the plaintiff has admitted she could not do, a full-time position, is eminently reasonable and not pretextural. The defendant has shown the plaintiff cannot produce sufficient evidence of pretext to rebut its reasons for choosing Sullivan.

## *Conclusion*

In summary we do not believe that the plaintiff's self-interested and conclusory assertions of age discrimination in the defendant's deposition, without more, overcomes the defendant's properly supported motion

for summary judgment. No genuine issue for trial exists on the plaintiff's claim under the PHRA.

## WRONGFUL DISCHARGE

In her amended complaint, the plaintiff avers she was discharged and not permitted to return to work because of her age and disabilities and was discharged in retaliation for her filing a workmen's compensation claim. She contends the discharge was contrary to law and public policy. Paragraphs 30-34. In her brief, however, she states that, on the claim of wrongful discharge, she relies on the public policy doctrine and argues it was violated by her alleged discharge in retaliation for filing the compensation claim. She abandons age and disabilities as factors for wrongful discharge.

The plaintiff's averments in this respect can be answered by flatly stating she was not discharged but removed herself. However, we will review this unsettled doctrine of wrongful discharge.

In *Paul v. Lankenau Hospital,* 524 Pa. 90, 569 A.2d 346 (1990), the Pennsylvania Supreme Court revisited its decision in *Geary v. United States Steel Corp.,* 456 Pa. 171, 319 A.2d 174 (1974) acknowledged to be the general ground breaking case on the adoption of this doctrine in the Commonwealth. It noted that it had specifically answered in the negative to the central question of "whether the time has come to impose judicial [restraints] on [the] employer's power of discharge." *Geary, supra* at 177, 319 A.2d at 176. It also examined its decision in *Clay v. Advanced Computer Applications,* 522 Pa. 86, 559 A.2d 917 (1989) in which Mr. Justice Flaherty wrote:

"It should be noted that, as a general rule, there is no common-law cause of action against an employer for termination of an at-will employment relationship.

*Geary v. United States Steel Corp.,* 456 Pa. 171, 319 A.2d 174 (1974). Exceptions to this rule have been recognized in only the most limited of circumstances, where discharges of at-will employees would threaten clear mandates of public policy." *Id.* at 89-90, 559 A.2d at 918. Mr. Chief Justice Nix, in his concurring opinion, stated that:

"[T]his court did not announce a cause of action for wrongful discharge in *Geary.* ... Indeed, the language in *Geary* clearly states that a cause of action for wrongful discharge in an at-will employment relationship does not exist." *Id.* at 98-99, 559 A.2d at 923. In Pennsylvania Trial Guide (Feldman Revision), Vol. 2, footnote no. 3, p. 717, the author comments that "There is some language in the Supreme Court's most recent decision in *Paul, supra,* which could be read as casting doubt on whether an action for wrongful discharge exists under any circumstances."

For the purpose of this decision, we will assume that the doctrine of wrongful discharge does exist in Pennsylvania.

The next question to be considered is what makes up this doctrine? At a certain time, in the Pennsylvania Superior Court, the view was taken that, for a cause of action for wrongful discharge for an at-will employee to be found, one of two circumstances had to be met, according to *Geary:* (1) The dismissal must have been made with the specific intent to harm *or* (2) it must be contrary to public policy. *Tourville v. Inter-Ocean Insurance Co.,* 353 Pa. Super. 53, 508 A.2d 1263 (1986). See also, *Gillespie v. St. Joseph's University,* 355 Pa. Super. 362, 513 A.2d 471 (1986); *Veno v. Meredith,* 357 Pa. Super. 85, 515 A.2d 571 (1986); *Scott v. Extracorporeal Inc.,* 376 Pa. Super. 90, 545 A.2d 334 (1988); *Booth v. McDonnell Douglas Truck Services,*

401 Pa. Super. 234, 585 A.2d 24 (1991). Evidently this interpretation has now been abandoned for it was stated in *Jacques, supra,* that the idea that "[A] discharge may be wrongful if it evidences a specific intent to harm is discredited in Pennsylvania law." *Id.* at 429, 619 A.2d at 753.

Pennsylvania courts have long recognized the rule that an employer may discharge his or her employees at any time for any or no reason in the absence of a contractual or statutory prohibition. *Gordon v. Lancaster Osteopathic Hospital Association,* 340 Pa. Super. 253, 489 A.2d 1364 (1985); *Betts v. Stroehmann Brothers,* 355 Pa. Super. 195, 512 A.2d 1280 (1986); *Clay v. Advanced Computer Applications, supra; Hineline v. Stroudsburg Electric Supply Co. Inc.,* 384 Pa. Super. 537, 559 A.2d 566 (1989). The so called "at-will rule" reflects the belief that the intimacy of the master-servant relationship and the need for managerial discretion defy judicial scrutiny. *Clay v. Advanced Computer Applications, supra.* There is no cognizable public policy against termination of employees who have performed their duties properly. *Betts v. Stroehmann Brothers, supra; Marsh v. Boyle,* 366 Pa. Super. 1, 530 A.2d 491 (1987). Pennsylvania has not adopted the "just cause" standard which would restrict an employer's right to terminate the employment of an employee for reasons constituting "just cause." *Betts v. Stroehmann Brothers, supra.* The fact that an employer's actions seem unfair is not enough. *McCartney v. Meadowview Manor Inc.,* 353 Pa. Super. 34, 508 A.2d 1254 (1986). The moral fairness of the firing is simply beyond the court's power to review. *Scott v. Extracorporeal Inc., supra.* Our analysis must extend beyond a mere inquiry into whether

the employee competently performed his duties. *Turner v. Letterkenny Federal Credit Union,* 351 Pa. Super. 51, 505 A.2d 259 (1985).

The right to dismiss at-will has, apparently in Pennsylvania, been tempered with the emergence of the common-law doctrine of wrongful dismissal whereby an employee may premise a cause of action on either tort or contract principles. *Id.; Clay v. Advanced Computer Applications, supra; Hineline v. Stroudsburg Electric Supply Co. Inc., supra.* It is the tort principle we are dealing with here and it is a violation of public policy which we must look for. An essential element in permitting a cause of action for wrongful discharge is a finding of a clearly defined mandate of public policy which strikes at the heart of a citizen's social right, duties and responsibilities. *McCartney v. Meadowview Manor, supra; Hineline v. Stroudsburg Electric Supply Co. Inc., supra.* In order to overcome the employer's interest in running a business, the employee must show a violation of clearly mandated public policy which strikes at the heart of a citizen's social right, duties and responsibilities. *Turner v. Letterkenny Federal Credit Union, supra; Householder v. Kensington Manufacturing Co.,* 360 Pa. Super. 290, 520 A.2d 461 (1987). An employer must intrude into an area of the employee's life in which the employer has no legitimate interest for the discharge to be actionable. *Booth v. McDonnell Douglas Truck Services, supra.* It is generally accepted that to be actionable, the asserted public policy must be one which is already articulated in law or constitutional provision. It is clear that discharges which are merely arbitrary do not contravene public policy. *Scott v. Extracorporeal Inc., supra.* The public policy exception to the at-will employment relationship is quite narrow. *McCartney v. Meadowview Manor Inc., supra;*

*Rinehimer v. Luzerne County Community College,* 372 Pa. Super. 480, 539 A.2d 1298 (1988); *Hineline v. Stroudsburg Electric Supply Co. Inc., supra.*

In *Cisco v. United Parcel Services Inc.,* 328 Pa. Super. 300, 306, 476 A.2d 1340, 1343 (1984) a two-part test was established to determine whether the discharged employee could recover damages against an employer for wrongful discharge: First, the court must decide "whether any public policy is threatened thereby; second, even when an important public policy is involved, an employer may discharge an employee if he has separate, plausible and legitimate reasons for doing so." *Rossi v. Pennsylvania State University,* 340 Pa. Super. 39, 489 A.2d 828 (1985); *Betts v. Stroehmann Brothers, supra; Marsh v. Boyle, supra; Rinehimer v. Luzerne County Community College, supra; Scott v. Extracorporeal Inc., supra.*

It is difficult to ascertain how wrongful *discharge* can be involved in the case before us because nowhere can we see that the plaintiff was ever terminated or dismissed by the defendant. The latter's affidavits state she was never discharged and the plaintiff has presented nothing to indicate otherwise. Her leave-taking, when she walked off the job on December 21, 1988 was a decision made solely by her to depart. The closest thing we can see that approaches a dismissal is when the plaintiff's position was posted, in accordance with the defendant's employment policy, on or about March 29, 1989. However, we are bound to observe that this was a full-time position with no part-time positions being available at the bank after the date the plaintiff left on December 21. The plaintiff did not know of any part-time positions being open. Dep. 117. As we have noted, her testimony varies whether she could have worked part-time or not at all.

We find two Pennsylvania state cases dealing with claims for wrongful discharge when an employee has been off work because of illness.

In *Tourville v. Inter-Ocean Insurance Co., supra,* an employee was discharged during a hospitalization. He subsequently filed a suit for wrongful discharge. As pointed out above, the court held that wrongful discharge could be based on one of two circumstances, the discharge must be made with specific intent to harm *or* it must be contrary to public policy. In affirming summary judgment for the defendant, the court discussed the former circumstances holding they were not present. Though this particular approach has been disavowed (see *Jacques, supra), Tourville* is germane here because a court which followed the *Jacques* reasoning said that specific intent to harm may be considered an example of when a discharge violates public policy. *Yaindl v. Ingersoll-Rand Co. etc.,* 281 Pa. Super. 560, 422 A.2d 611 (1980). *Tourville* went on to note that the defendant was discharged simply because he had fallen ill and could not perform his duties. Finding that this did not constitute a specific intent to harm, the court stated, "This could, without any doubt, provide sufficient reason for an employer to discharge an employee. ..." *Id.* at 57, 508 A.2d at 1266.

In *Householder v. Kensington Mfg. Co., supra,* the plaintiff was employed by the defendant for nine years marked by two bouts of severe asthma. When she returned to work after the second one, she was informed that she was being discharged from her employment for the sake of her health. Summary judgment was properly granted the employer in the employee's suit for wrongful discharge as, inter alia, she could not, under the facts of this case, maintain the action.

In the present case, the plaintiff's contentions of retaliation are based upon the vaguest of assertions not borne out by the facts. Dep. 209-212. In June of 1987 she filed a worker's compensation claim. In October of 1987 she was out for a month and came back to work without further ado.[2] Beyond this however, it is the employment policy of the defendant that when an employee has a disability lasting in excess of 90 calendar days (which the plaintiff stoutly contends that she has) and business necessity requires that the vacated position be filled, then that position will be posted. The only connection between the plaintiff's worker's compensation claim and the posting of her old full-time job is that, by her own admission, she cannot perform it due to her work-related injuries. Therefore the public policy of the plaintiff's being able to file for worker's compensation without retaliation is not threatened since no retaliation was visited upon her in March 1989. Secondly, even if important public policy was magically involved, the defendant has a separate, plausible and legitimate reason for posting the plaintiff's job, *i.e.,* since she was not able or willing to fill it, business necessity dictated that the duties be performed by someone else. Wrongful discharge is just not present in this case.

---

2. The worker's compensation claim was eventually commuted for $70,000. We presume this claim pertained to physical injuries from falling at the bank in June 1987 and not from emotional distress which she claims resulted from leaving on December 21, 1988. Dep. 303, 308. However, plaintiff believes the events of that date caused the physical pain of her herniated and protruded discs to escalate due to the stress. Dep. 355. Has she thus received worker's compensation for any job related emotional distress to the exclusion of the common law action? We don't know.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

A claim for intentional infliction of emotional distress can be made in two ways. One method is showing that the defendant, through his negligence, was the proximate cause of the emotional injury to the plaintiff. The second method is by showing that the defendant acted intentionally or recklessly to cause the emotional injury to the plaintiff. *Stoddard v. Davidson,* 355 Pa. Super. 262, 513 A.2d 419 (1986). We are concerned with the second method here.

So far as it is possible to generalize the rule which seems to have emerged is that there is liability for conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind. Prosser and Keeton on Torts (5th ed. 1984), p. 60. On this subject The Restatement (Second) of Torts, §46, provides:

"One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." Thus, the tort involves four elements: (1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe. *Martin v. Municipal Publications,* 510 F. Supp. 255 (1981); *Brieck, supra.* There is no occasion for the law to intervene in every case where someone's feelings are hurt. Summary of Pennsylvania Jurisprudence 2d Torts, §10:22. There is virtually unanimous agreement that defendants are not liable for mere insult, indignity, annoyance, or even threats, where the case

is lacking in other circumstances of aggravation. The reasons for this position are not far to seek. Our manners, and with them our law, have not yet progressed to the point where we are able to afford a remedy in the form of tort damages for all intended mental disturbance. Liability cannot be extended to every trivial indignity. The plaintiff must necessarily be expected and required to be hardened to acts that are definitely inconsiderate and unkind. Prosser and Keeton, *supra,* p. 59. The requisite intention necessary to support the intentional infliction of emotional distress cause of action does not arise simply from the fact that the defendant's actions were intentional but is based on knowledge on the part of the defendant that severe emotional distress is substantially certain to be produced by his conduct. *Jackson v. Sun Oil Co. of Pennsylvania,* 361 Pa. Super. 54, 521 A.2d 469 (1987).

It is for the court to determine, in the first instance, whether the actor's conduct can reasonably be regarded as so extreme and outrageous as to permit recovery. *Martin v. Municipal Publications, supra; Dawson v. Zayre Department Stores,* 346 Pa. Super. 357, 499 A.2d 648 (1985); *Reimer v. Tien,* 356 Pa. Super. 192, 514 A.2d 566 (1986); *Daughen v. Fox,* 372 Pa. Super. 405, 539 A.2d 858 (1988); *Cox v. Keystone Carbon,* 861 F.2d 390 (1990); *Motheral v. Burkhart,* 400 Pa. Super. 408, 583 A.2d 1180 (1990); *Hackney v. Woodring,* 424 Pa. Super. 96, 622 A.2d 286 (1993); *Britt v. Chestnut Hill College,* 429 Pa. Super. 263, 632 A.2d 557 (1993); *Zikria v. Association of T. & C. Surgeons,* 432 Pa. Super. 248, 637 A.2d 1367 (1994).

Having set forth a general purview of the doctrine of intentional infliction of emotional distress we must now examine its applicability in the present instance.

a.

Does the doctrine of intentional infliction of emotional distress obtain in Pennsylvania?

"In *Kazatsky v. King David Memorial Park Inc.,* 527 A.2d 988 (1987), the Pennsylvania Supreme Court analyzed and dismissed an intentional infliction of emotional distress claim, but it expressly declined to consider whether such a cause of action exists in Pennsylvania. Following such ambiguous authority, courts interpreting Pennsylvania law continue to dispute the viability of the tort." *Glickstein v. Consolidated Freightways,* 718 F. Supp. 438, 439 (1989).

Thus, in *Hackney v. Woodring, supra,* it was stated that the courts in this jurisdiction have recognized a cause of action under section 46. In *Motheral v. Burkhart, supra,* it was said that though the Supreme Court, through *Kazatsky,* has left to another day the question of the viability of section 46 in Pennsylvania, the Superior Court has recognized the existence of this doctrine and further the statement in *Ford v. Isdaner,* 374 Pa. Super. 40, 542 A.2d 137 (1988) that this court was not inclined to embrace section 46 was mere dictum.

*Buczek v. First National Bank,* 366 Pa. Super. 551, 531 A.2d 1122 (1987) notes that the Pennsylvania Supreme Court has clarified that it has never adopted section 46 as the law of the Commonwealth. In *McNeal v. City of Easton,* 143 Pa. Commw. 151, 598 A.2d 638 (1991) the court pointed out that counsel had not provided, nor its research disclosed, any case from that court or the Pennsylvania Supreme Court that explicitly states that the tort of intentional infliction of emotional distress exists in Pennsylvania but that several Supreme Court decisions have implied that the tort does exist; prior Superior Court decisions imputed the same thing

and therefore the court concluded that the tort of intentional infliction of emotional distress is recognized by Pennsylvania courts.

We will adopt one of the courses set forth in Summary of Pennsylvania Jurisprudence 2d, Torts, §10:20, p. 380, *i.e.,* that section 46 is to be recognized in Pennsylvania until the Supreme Court squarely decides to the contrary.

b.

Is the plaintiff's claim barred by the exclusivity provision of the Pennsylvania Workmen's Compensation Act?

In pertinent part, the exclusivity provision of the Act provides as follows:

"The liability of an employer under this act shall be exclusive and in place of any and all other liability to such employes ... or anyone otherwise entitled to damages in any action at law ... ." 77 Pa.C.S. §481(a).

The law is of two minds in this field also. "Despite authority recognizing the potential liability of an employer for psychic injury to an employee through extreme and outrageous conduct on its part, a number of courts applying Pennsylvania law have recently held that, at least where the emotional distress is caused by actions of the employer itself, such claims are generally barred by the exclusive remedy provision of the state Workmen's Compensation Act. ..." Summary of Pennsylvania Jurisprudence 2d, Torts, §10:40.

In the first category recognizing liability on the part of the employer the following are cases in all of which the theory of intentional infliction of emotional distress was pressed without the Act's exclusivity clause being invoked by the opponent or court and in some of which the employee was successful: *Cory v. Smithkline Beck-*

*man,* 585 F. Supp. 871 (E.D. 1984) (incidents continually repeated become outrageous); *Connolly v. Proctor & Gamble Distributing Co.,* 37 D.&C.3d 231 (1985) (profane and personally abusive manner by supervisors, constant secret surveillance); *Rinehimer v. Luzerne County Community College, supra* (discharge of college official); *Bowersox v. P.H. Glatfelter Co.,* 677 F. Supp. 307 (1988) (sexual harassment, stalking); *Butler v. Flo-Ron Vending Co.,* 383 Pa. Super. 633, 557 A.2d 730 (1989) (planting of evidence to indicate theft, criminal prosecution); *Jacques v. Akzo International Salt Inc., supra* (fired employee); *Hackney v. Woodring, supra* (sexual harassment).

On the other hand, the Pennsylvania Supreme Court has held that the Act provides the exclusive means by which a covered employee can recover against an employer for injury in the course of his employment. *Poyser v. Newman & Co. Inc.,* 514 Pa. 32, 522 A.2d 548 (1987). In cases specifically involving intentional infliction of emotional distress allegedly visited upon an employee by an employer, it has been held that the Workmen's Compensation Act covers all injuries and the exclusivity clause in 77 Pa.C.S. §481 bars all civil actions flowing from work-related injuries. *Rosipal v. Montgomery Ward,* 360 Pa. Super. 570, 521 A.2d 49 (1987); *Papa v. Franklin Mint Corp.,* 400 Pa. Super. 358, 583 A.2d 826 (1990). The Act bars common-law claims for intentional infliction of emotional distress. *Glickstein v. Consolidated Freightways, supra; Weister v. Cumberland Farms of N.J. Inc.,* 4 D.&C.4th 356 (1989).

c.

Assuming, without deciding, that even if the said Act does not bar common-law recovery, did the de-

fendant's alleged conduct rise to the level of outrageousness necessary to state a claim for intentional infliction of emotional distress? Was the employer's alleged conduct so malicious, arbitrary or personally abusive as to warrant compensation for the employee's claimed mental anguish?

A claim for intentional infliction of emotional distress is made out only where conduct is so outrageous and extreme that it goes beyond all bounds of decency and would be regarded as atrocious and utterly intolerable in a civilized community. *Banyas v. Lower Bucks Hospital,* 293 Pa. Super. 122, 437 A.2d 1236 (1981); *Lazor v. Milne,* 346 Pa. Super. 177, 499 A.2d 369 (1985); *Buczek v. First National Bank, supra.* It is major outrage. *Lazor v. Milne, supra; Daughen v. Fox, supra.*

Pennsylvania courts have been chary to declare conduct "outrageous" so as to permit recovery for intentional infliction of emotional distress and have allowed recovery only in limited circumstances where the conduct has been clearly outrageous. *Cox v. Keystone Carbon Co., supra.* The extremeness of behavior associated with this tort necessarily means that it rarely will be found. *Brieck v. Harbison-Walker Refractories, supra.*

For illustrative cases in which the doctrine has been successfully invoked see: *Wilkinson v. Downton,* 2 Q.B. 57 (1897) (the seminal case in which a practical joker amused himself by telling a woman that her husband had been smashed up in an accident and was lying at an inn with two legs broken); *Great Atlantic & Pacific Tea Co. v. Roch,* 153 A.2d 22 (Md. 1930) (wrapping up a gory, dead rat instead of a loaf of bread and turning it over to a customer); *Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265 (1979) (defendant team doctor told reporter, with knowledge of its falsity, that member of team suffered from potentially fatal blood

disorder); *Papieves v. Kelly*, 437 Pa. 373, 263 A.2d 118 (1970) (defendant's car hit and killed plaintiff's son, and then without obtaining medical assistance or notifying policy, defendant buried body); *Banyas v. Lower Bucks Hospital, supra,* (defendant hospital's employees and doctors intentionally prepared inaccurate records charging plaintiff with causing the death of a third party which resulted in plaintiff being indicted on a homicide charge).

For situations where the courts determined major outrage was not present, the following two cases are illuminating:

In *Britt v. Chestnut Hill College, supra,* a normal male was ordered to submit himself to a grope by a homosexual as a part of class instruction, and when he refused, the teacher assigned the homosexual to the student as a "facilitor" to deal with his "anger." The teacher then sabotaged the student's academic career by having certain preapproved credits he needed for his master's degree revoked. The Superior Court upheld the lower court's demurrer determining that the complaint set forth insufficient facts to support the plaintiff's claim of intentional infliction of emotional distress and it adopted the lower court's language that the class was a learning environment, and in such an atmosphere plaintiff should expect to hear open criticism, exchange of ideas and to expect embarrassment at times.

See also, *Doe v. Dyer-Goode, supra,* where the plaintiff had blood withdrawn for a pre-marital blood test but didn't consent to an AIDS test. This test was done nevertheless and the plaintiff was told he tested positive. Subsequent retesting was negative. The court believed that the facts presented did not, as a matter of law, show extreme and outrageous conduct.

It can be seen from these cases that the conduct of the erring party must be extreme indeed.

The work environment is one in which employees must expect to be evaluated, not always favorably; thus questioning, criticism and discharge of an employee do not necessarily constitute outrageous conduct. Prosser and Keeton on Torts, 1988 Supplement, p. 18.

"While it is not true that an employment situation could never give rise to this tort, it is extremely rare to find conduct in the workplace rising to the necessary level of outrageousness. Favoritism, unjustified criticism, snubs, betrayed confidences, and adverse employment actions, while perhaps unfair, are not considered outrageous in our society. An employer will not ordinarily be liable for inflicting emotional distress on an employee by overloading him with work, subjecting him to unusually intense scrutiny, reassigning him to a less desirable job, taking away amenities, withholding raises, or creating a generally oppressive work environment, even where such conduct is intended to force the employee to quit or retire." Summary of Pennsylvania Jurisprudence 2d, Torts, §10:36.

An examination of three cases involving employment situations and claims of intentional infliction of emotional distress is of interest.

In *Rinehimer v. Luzerne County Community College, supra,* the president of the school was discharged for bringing alleged criminal activities by other employees before the board of trustees causing an uproar. In upholding a nonsuit on the claim for damages for intentional infliction of emotional distress the Superior Court stated:

"[W]e do not agree that an employment situation could *never* give rise to the tort of intentional infliction of emotional distress. We are not called upon here, however, to outline the instances in which it might arise. We simply fail to find, after viewing all the evidence presented by Rinehimer in the light most favorable to him, that the conduct of his employer was so extreme and outrageous that a claim for intentional infliction of emotional distress was established." *Id.* at 495, 539 A.2d at 1305. (emphasis in original)

In *Jacques v. Akzo International Salt Inc., supra,* the plaintiff was terminated after a troubled tenure as the company's credit manager. He claimed damages on the basis of intentional infliction of emotional distress because there was evidence in his deposition from which a suicide attempt (as the result of his firing) might be inferred. Summary judgment against the plaintiff was upheld. The court pointed out that job termination was not conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be intolerable in a civilized community. It is the conduct which must be outrageous, not the reaction to the conduct.

*Hackney v. Woodring, supra,* concerned an 18 year old female employee of a day care center. She contended her male employer had, during numerous incidents, forcibly held her down on his lap and engaged in unwanted touching, fondling and spanking. He also threatened the plaintiff's life while ripping off her clothes and exposing himself. The defendant, after spreading rumors about the plaintiff, eventually discharged her from her job after publicly praying over her. "Here, we are confronted with the sexual harassment, intimidation, abuse and retaliatory discharge of a young woman, just 18

years of age, in her first job, by her employer, a man in a position of authority." *Id.* at 102, 622 A.2d at 289. The original verdict for the plaintiff, wiped out by the judgment n.o.v., was ordered reinstated.

In viewing the record in the case before us in the light most favorable to the plaintiff, the non-moving party, accepting as true all well pleaded facts in the plaintiff's pleadings, as well as admissions on file, giving them the benefit of all reasonable inferences to be drawn therefrom, is the plaintiff entitled to go forward on her claim for intentional infliction of emotional distress? We think not but on the contrary believe that the defendant has met its burden of proving that there exists no genuine issue as to any material act on this subject. It is true that the plaintiff, in the deposition, claimed she suffered from emotional distress as the result of the defendant's conduct. However, it is not our belief that the defendant's conduct here meets the test of extremeness required by this theory.

## PUNITIVE DAMAGES

In Count IV of her amended complaint, the plaintiff demands punitive damages because the actions of the defendant, through its agents, servants and/or employees, were willful, malicious, outrageous and with the intent to cause harm.

Punitive damages are included in tort law and are awarded against a person to punish him for his outrageous conduct and to deter him and others like him from similar conduct in the future. Restatement (Second) of Torts, §908(1) (1979); *Colodonato v. Consolidated Rail Corp.,* 504 Pa. 80, 470 A.2d 475 (1983). Punitive damages may also be awarded under the PHRA. *Brown*

*Transport v. Human Relations Commission,* 133 Pa. Commw. 545, 578 A.2d 555 (1990). However, a claim for punitive damages being derivative, an element merely incidental to an underlying cause of action, they may not be awarded where the underlying cause asserted is not proven or is dismissed. Summary of Pennsylvania Jurisprudence 2d Torts, §9:75; *Kirkbride v. Lisbon Contractors Inc.,* 521 Pa. 97, 555 A.2d 800 (1989).

The causes of action in the present case being dismissed, there are no grounds for punitive damages.

## EQUITABLE RELIEF

Under the equitable powers of the PHRA the plaintiff claims she is entitled to be returned to her former position and be given the same duties as well as promotions and where necessary have accommodations made for training to insure that she is able to carry on the said employment and position to which she is entitled to be promoted; that she be given back wages from the date of her termination; that she be immediately given such raises and other increments with the same seniority rights and benefits to which she would have been entitled had she been retained in the position originally "and the discrimination, harassment, wrongful discharge and intentional infliction of emotional distress had not occurred."

It is true that a court of common pleas, under 43 P.S. §962(c)(3), may grant "any legal or equitable relief as it deems appropriate." See *Pennsylvania Human Relations Commission v. Zamantakis,* 478 Pa. 454, 387 A.2d 70 (1978); *Lubin v. American Packaging Corp.,* 760 F. Supp. 450 (E.D. Pa. 1991). However, that is where "unlawful discriminatory practice" has been

found to exist. In the case before us, the defendant has demonstrated clearly that there is no genuine issue of material fact existent on this score. There is no equitable relief that can be given.

## ORDER

Now, February 9, 1995, for the reasons set forth in the accompanying opinion, the defendant's motion for summary judgment is granted; the complaint is dismissed.